IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

KENT REYNOLDS,                          )
       Plaintiff,                    )
                          )      Civil Action No. 4:15-cv-56
v.                                      )
                          )      REPORT AND RECOMMENDATION
COMMISSIONER OF                         )
SOCIAL SECURITY,                        )      By:    Joel C. Hoppe
       Defendant.                    )      United States Magistrate Judge

Plaintiff Kent Reynolds asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying his application for disability insurance benefits

("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is

before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 13. Having considered the

administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's

decision is supported by substantial evidence. Therefore, I recommend that the Court **DENY**

Reynolds's motion for summary judgment, ECF No. 14, **GRANT** the Commissioner's motion

for summary judgment, ECF No. 16, and **AFFIRM** the Commissioner's final decision.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

Case 4:15-cv-00056-JLK-JCH   Document 18   Filed 02/06/17   Page 1 of 30   Pageid#: 654

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through

four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Reynolds applied for DIB on June 19, 2012, alleging disability caused by arthritis, cervical stenosis, and sensory loss in the left arm. Administrative Record ("R.") 58, ECF No. 10. At the time of his alleged onset date of July 13, 2011, Reynolds was forty-six years old. *Id.* Disability Determination Services ("DDS"), the state agency, denied his claims at the initial, R. 58–66, and reconsideration stages, R. 69–79. On May 1, 2014, Reynolds appeared with counsel at an administrative hearing before ALJ Marc Mates. R. 40–57. Reynolds testified about his past work, medical conditions, and the limiting effect these conditions had on his daily activities. *See* R. 42–51. A vocational expert ("VE") also testified at this hearing regarding the nature of Reynolds's past work and his ability to perform other jobs in the national and local economies. *See* R. 51–56.

ALJ Mates denied Reynolds's claim in a written decision issued on June 25, 2014. R. 20–33. ALJ Mates found that Reynolds had severe impairments of degenerative disc disease, left arm difficulty, hypertension, and diabetes mellitus, but that these impairments did not meet or medically equal the severity of a listed impairment. R. 22–23. As to Reynolds's residual functional capacity ("RFC"), the ALJ found that he could perform sedentary work,[1] but must avoid concentrated exposure to heights and more than occasional use of the non-dominant (i.e., left) hand for overhead reaching and gross and fine manipulation. R. 23–32. Relying on the RFC and the testimony of the VE, the ALJ found that Reynolds could not perform his past relevant

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

work, but could perform jobs existing in the national and local economies, including surveillance system monitor and call-out operator. R. 32–33. Therefore, ALJ Mates determined that Reynolds was not disabled. R. 33. The Appeals Council denied Reynolds's request for review, R. 1–3, and this appeal followed.

III. Facts

*A.    Relevant Medical Evidence*

On March 23, 2006, X-rays of Reynolds's cervical spine revealed degenerative disc disease of the mid and lower cervical spine with disc space and bony neural foraminal narrowing at C4-C5, C5-C6, and C6-C7, and bony neural foraminal narrowing at C3-C4. R. 337. An MRI from April 4, 2006, also showed a large protrusion at C4-C5, a prominent bulge at C5-C6, and a disc osteophyte complex at C6-C7, all of which impressed the thecal sac. R. 335. The bulge at C5-C6 also caused significant impression on the spinal cord. *Id.*

On July 14, 2011, a day after his alleged onset date, Reynolds visited one of his primary care physicians, John Hoffman, M.D., because his neck had been bothering him at work. R. 264. A physical exam showed a slight decrease in the range of motion in the neck and negative straight leg raise test. *Id.* Dr. Hoffman ordered imaging of the cervical spine to further assess the situation. *Id.* Radiology reports and an MRI, compared to Reynolds's 2006 MRI, showed interval progression of the disc disease, increased signal intensity with the cervical cord at C4, C5, C6, and development of gliosis of the cervical cord. R. 275, 276.

On August 18, Reynolds saw John Jane, M.D., Ph.D., for a neurological consultation. R. 233–34. Dr. Jane reviewed the imaging, confirmed Reynolds had C4-C5, C5-C6, and C6-C7 disease on the left, and ordered a CT myelogram and electromyography ("EMG") studies. R. 234. The studies revealed electrophysiological evidence of left chronic C7 radiculopathy with

4

ongoing denervation, but no compelling evidence of polyneuropathy, R. 233, and significant neural foraminal stenosis and herniated nucleus pulposus at C6-C7, R. 223.

On October 3, Reynolds presented to University of Virginia ("UVA") Hospital East with a primary diagnosis of cervical stenosis. R. 223. His left arm was observed to be noticeably weak, particularly in the triceps and grip strength. *Id.* Based on his past medical history and his present symptoms, Reynolds was deemed a reasonable operative candidate, and Dr. Jane proceeded with a left C6-C7 foraminotomy and a left C6-C7 posterior diskectomy. R. 224. Dr. Jane subsequently referred Reynolds to physical therapy as part of his recovery. R. 456. Reynolds saw Christine Black, PT, DPT, roughly twice a week from October 13 through November 10. R. 428–51. PT Black discharged Reynolds on November 23, however, having failed to get in touch with him after several attempts. R. 422–25. She noted that Reynolds had denied experiencing improvement in symptoms and complained of increased pain. R. 425. She opined that extended therapy may be necessary to treat his severe symptoms. *Id.*

On November 18, Reynolds returned to UVA and saw Thomas Szabo, PA. R. 226. PA Szabo noted that Reynolds had not done as well as expected following the surgery. R. 227. A physical exam revealed loss of fine touch sensation in the thumb, index, and middle fingers of both hands and in the left lateral forearm and triceps. *Id.* Reynolds had normal strength in both legs; findings of 5/5 for all motor tests in the right arm; 3+/5 grip strength, 4+/5 wrist flexion, 5/5 wrist extension, 5/5 biceps, 4+/5 triceps, and 5/5 deltoid in the left arm; normal tandem gait; no Romberg's sign; and negative Lhermitte's sign and Spurling's test. *Id.* PA Szabo gave Reynolds a note to be off work until January 2, 2012, ordered a follow-up CT myelogram of the cervical spine, and started him on Neurontin. *Id.* The myelogram demonstrated that in spite of interval improvement, there still existed persistent moderate neuroforaminal narrowing at C6-C7 with

5

resolution of the spinal canal stenosis, persistent moderate central canal stenosis at C4-C5 with mass effect on the spinal cord, and severe left-sided and moderate-to-severe right-sided neuroforaminal narrowing at C5-C6. R. 243.

Reynolds continued to see a variety of medical providers in 2012. On January 11, 2012, he visited Dr. Jane, who indicated that although all the muscle groups in Reynolds's left side were weak, Dr. Jane felt it was effort dependent. R. 223. Neurological exam showed that Reynolds had a normal affect, full strength, and intact sensation to light touch and pinprick. *Id.* An EMG showed no active denervation. *Id.* Dr. Jane added:

> I just don't know what further we can do from a surgical point of view. He has had physical therapy and injections without relief. . . . I don't think I am going to be able to come up with a plan that will relieve his pain, the significance of which is not clear to me.

*Id.*

On January 13, Reynolds saw Dr. Hoffman, who found decreased range of motion in the neck, decreased grip strength on the left, and light touch sensation a little decreased over the thenor side as opposed to the ulnar. R. 261. Dr. Hoffman assessed cervical radiculopathy and hypertension. *Id.* Dr. Hoffman referred Reynolds to Neurology Associates of Lynchburg, Inc., where he saw Peter Konieczny, M.D., on February 3. R. 252. Dr. Konieczny performed a physical exam, which showed decreased muscle bulk in the left triceps, biceps, deltoid, and brachioradialis, but no evidence of fasciculations; weakness in the left biceps at 4+ MRC, left triceps at 4+, left finger and wrist extensors at 4-, and left deltoid at 4/5 MRC; full strength and normal muscle tone in the bilateral lower extremities; and decreased sensation to pin, vibration, and temperature in the left forehand and arm. R. 253. Dr. Konieczny explained that because of Reynolds's left hand weakness, he could not presently grasp or manipulate objects, and that his problems likely stemmed from a chronic history of cervical radiculopathy and the resultant

6

neuropathic damage. *Id.* He did note, however, that it was unlikely that further cervical surgery would help Reynolds. *Id.* On March 5, Dr. Konieczny reaffirmed his view that Reynolds was not a surgical candidate, and he increased Reynolds's Neurontin dose. R. 251.

Reynolds saw Dr. Hoffman again on March 29, this time complaining of trouble with his lower back and hips. R. 256. A physical exam revealed negative straight leg raise test, and Dr. Hoffman observed that Reynolds ambulated without too much difficulty and had fair range of motion in the lumbar spine, but still used his left arm sparingly. *Id.* Dr. Hoffman assessed low back pain, hip pain, and cervical stenosis, prescribed Tramadol, and ordered X-rays of the low back and hips. *Id.* The X-rays of the lumbar spine revealed fairly advanced facet degenerative changes at L5-S1 with approximately 7–8 mm of anterolisthesis of L5 on S1 and similar findings to a lesser degree at L4-L5. R. 274. The X-rays of the hips showed nearly normal findings, with only minimal degenerative narrowing bilaterally. *Id.* On April 5, Reynolds visited Dr. Konieczny, who noted a history of degenerative disc disease and osteoarthritis. R. 250. Dr. Konieczny explained that tripling the Neurontin dosage had provided only minimal-to-moderate pain relief. *Id.* He also indicated that he discussed further treatment options, including possibly a referral to a pain center, but that Reynolds wished to pursue more conservative options such as physical therapy first, which Dr. Konieczny thought were "perfectly appropriate at this stage." *Id.*

Reynolds began seeing PT Black again for physical therapy on April 12. R. 413. On examination, Reynolds demonstrated limited active range of motion of the lumbar spine, positive midline Slump Test, positive Neurotension Test on the right and left, and positive straight leg raise test on the right and left. R. 414. PT Black recommended physical therapy three times per week for twenty-four total visits, R. 415, which Reynolds attended until mid-July, R. 345.

7

During these visits, PT Black assessed general improvement overall. *See, e.g.*, R. 390 (decreased pain and progression without exacerbation on May 14), 380 (improved hip external rotation, flexion mobility, and range of motion as well as lumbar paraspinals on May 29), 378 (overall improvement in mobility on May 30), 366 (demonstrates improved range of motion and ability to ambulate three times the distance he had been walking without a break on June 13), 360 (improvements on straight leg raise test on June 20), 356 (improvement in subjective reports as well as great improvement in muscle mobility on June 27), 347–48 (note indicating slow progress towards goals on July 16).

Reynolds saw Dr. Hoffman again on May 11, and Dr. Hoffman observed that Reynolds walked with a little bit of a limp on the left side and seemed to move his left arm okay. R. 255. He also noted that a straight leg raise test was negative. *Id.* Dr. Hoffman assessed cervical stenosis, low back pain, diabetes, and hypertension. *Id.* On May 15, Dr. Jane completed a musculoskeletal questionnaire regarding his treatment of Reynolds. R. 277–80. Dr. Jane diagnosed cervical stenosis and identified Reynolds's symptoms as including neck pain and pressure, numbness and weakness in the left arm, and tightness and numbness in the right hand. R. 277. Dr. Jane acknowledged that sensory loss and muscle weakness constituted positive objective signs of Reynolds's pain, R. 278, but further opined that no clinical findings or laboratory and test results provided an explanation for his symptoms, R. 277. Reynolds returned to Dr. Hoffman on July 26 and relayed that physical therapy had not been effective and that his neck and arm continued to hurt. R. 559. Dr. Hoffman noted that on examination, Reynolds walked stiffly, was well muscled, and had positive straight leg raise test near ninety degrees. R. 560.

8

On August 13, Reynolds visited the Orthopaedic Center of Central Viginia and treated with Kamal Chantal, PA-C. R. 459–63. PA-C Chantal diagnosed spondylolisthesis, low back pain, lumbar spondylosis without myelopathy, and sciatica. R. 459. On examination, Reynolds walked with a normal, non-antalgic gait; was negative for Patrick's Faber test; experienced back pain with straight leg raise test on the right, but was negative on the left; was moderately restricted in flexion, extension, and lateral bending; and had no pain with hip motion. R. 459–60. PA-C Chantal also ordered an MRI of the lumbar spine, which showed a dominant finding of grade 2 spondylolisthesis of L5 on S1 secondary to bilateral pars defects of L5 with pseudodisc of listhesis severely narrowing the neural foramen and effacing the exiting L5 nerve roots bilaterally. R. 465. The MRI also showed mild-to-moderate foraminal narrowing at L4-L5, subtle retrolisthesis of L3 and L4, and abutment of the L4 nerve roots. *Id.* During a follow-up visit on August 29 to obtain the results of his MRI, PA-C Chantal scheduled Reynolds for a bilateral L5-S1 nerve root block ("NRB"), R. 466, which Joyce Huerta, M.D., administered on September 19, R. 474. On October 16, PA-C Chantal and Reynolds discussed further treatment options, including medications, more injections, physical therapy, and surgery. R. 491. Reynolds returned to his orthopedist's office on December 21, claiming that the pain in his lower back, which had been on the left side prior to the NRB, was now greater on the right. R. 495. Jesse Stem, M.D., who had been supervising PA-C Chantal's treatment of Reynolds, diagnosed sciatica, spondylolisthesis, lumbar pain, and radiculopathy. *Id.* Dr. Stem recommended that Reynolds try a right L5-S1 NRB with Dr. Huerta and explained to Reynolds that his options included trying another series of injections or undergoing a fusion. *Id.* Reynolds opted to try another injection, *id.*, which Dr. Huerta administered on January 9, 2013, R. 502.

9

On February 22, 2013, Reynolds visited Dr. Stem and reported that he could walk better after the injections, but still had pain in his low back and right leg. R. 503. Dr. Stem diagnosed sciatica, spondylolisthesis, lumbar pain, and radiculopathy, and recommended another right L5-S1 NRB with Dr. Huerta, *id.*, which Reynolds received on March 20, R. 510. He explained to Reynolds that the only remaining options were to "live with it or undergo surgery," and also stated that Reynolds was "unable to work at this time." R. 503. Reynolds returned to Dr. Stem on May 3 with similar symptoms, and he reported that the injection worked for about six to eight weeks, but he was not 100%. R. 511. Reynolds also told Dr. Stem that the hydrocodone helped in that it enabled him to sleep better. *Id.* Dr. Stem diagnosed radiculopathy, lumbar pain, spondylolisthesis, and lumbar spinal stenosis, refilled Reynolds's hydrocodone, and scheduled him for another right L5-S1 NRB, *id.*, which Dr. Huerta administered on May 29, R. 518. Reynolds followed up with Dr. Stem on July 31, this time reporting more relief than previously realized from the prior injections, especially with walking. R. 519. Dr. Stem diagnosed spondylolisthesis, radiculopathy, lumbar spinal stenosis, and lumbar pain, refilled Reynolds's hydrocodone, and recommended another right L5-S1 NRB, *id.*, which Dr. Huerta administered on August 21, R. 525.

Reynolds returned to Dr. Hoffman on August 20 for treatment concerning his diabetes and hypertension. R. 488. A physical exam revealed normal findings, including normal gait and intact deep tendon reflexes in all extremities, and Dr. Hoffman continued Reynolds's medications. R. 489. On November 11, Reynolds saw Dr. Hoffman for a follow-up regarding his hypertension and diabetes, and he also reported having moderate difficulty sleeping. R. 486. Dr. Hoffman noted no changes in the physical exam from the previous visit, continued Reynolds on his diabetes and hypertension medicine, and started him on Ambien. R. 486–87. Reynolds

10

returned to Dr. Stem on December 4 and reported that the injections had been helping and he felt that his current pain management was "good enough." R. 528. Dr. Stem recommended that he continue receiving injections as needed to manage the pain and advised Reynolds that he could get three injections every six months. *Id.* Dr. Huerta administered a right L5-S1 NRB on December 18 with no complications. R. 533. On February 27, 2014, Reynolds followed up with Dr. Hoffman to treat his diabetes and hypertension. R. 481. Dr. Hoffman noted no issues and continued him on his medications. R. 481–83. Reynolds then received another right L5-S1 NRB from Dr. Huerta on March 5 with no complications. R. 536.

B.      *Reynolds's Submissions and Testimony*

As part of his claim for benefits, Reynolds submitted a function report on July 16, 2012. R. 176–83. Reynolds indicated that he lived with family and on a typical day, if he did not attend physical therapy, he would stay around the house relaxing. R. 176. He claimed that his pain was significant enough to prevent him from falling asleep, but he did not have a problem with personal care. R. 177. He did, however, need reminders to take medicine on occasion. R. 178. Reynolds stated that he did not prepare his own meals or do any house or yard work because of the pain. R. 178–79. He went outside daily and could do so alone, and he was able to walk, drive, and ride in a car, but only shopped for groceries once every few months. R. 179. Reynolds also noted that his conditions negatively impacted his hobbies, interests, and social activities. R. 180. Whereas Reynolds used to hunt, race his car, and socialize, his pain interfered with his enjoyment of such activities and limited him to doing them rarely, if at all. *Id.* He further noted that his pain made him grumpy, which affected his personal relationships as he would sometimes take it out on friends, family, and neighbors. R. 181. Reynolds reported that he had difficulty with lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, completing

11

tasks, concentrating, using his hands, and getting along with others. *Id.* As a result, he claimed that he could walk only about two hundred feet before needing to rest until the pain subsided and that he could lift hardly any weight. *Id.*

At the administrative hearing, Reynolds testified that although he could drive, his wife drove him to the hearing and he experienced very little discomfort traveling. R. 42–43. He described his neck and back problems, stating that the pain extends to his left arm, right leg, and both hips and that he takes hydrocodone for relief. R. 43–44. He also explained that his diabetes and blood pressure were adequately controlled by medication, but that the diabetes medicine upset his stomach. R. 44. As to his physical limitations, Reynolds could stand for ten minutes and walk for five minutes at a time on a concrete surface, and he could sit for maybe five to ten minutes at a time in a straight-backed chair. R. 45. He does not sleep well at night; lies back in a recliner approximately four hours per day, which is when he experiences the least pain; struggles with bending over to pick up objects; and can tolerate squatting, but not standing back up. R. 44–46, 49. Reynolds has no feeling in his left hand, but is right-handed and able to write. R. 46. A week prior to the hearing, he was able to lift fifteen pounds with both hands. *Id.* Reynolds further testified that although he underwent surgery for his neck and back, he does not feel that it improved his pain. R. 48.

C.    *Opinion Evidence*

1.    *Reynolds's Wife*

Reynolds's wife filled out a third party function report on July 16, 2012, in which she reaffirmed many of his claims regarding his activities of daily living and physical functioning. R. 184, 188–97. For example, she noted that he primarily stayed at home watching television when he was not attending physical therapy, R. 188; experienced trouble sleeping, but had no problems

12

with personal care, R. 189; rarely prepared his own meals and did essentially no house or yard work, despite wanting to help, R. 190–91; went outside alone daily, weather permitting, and could drive a car, R. 191; could no longer engage in his hobbies and interests because of his conditions, R. 192; and sometimes had problems getting along with others because of stress, R. 193. She also indicated that his impairments caused him difficulty with lifting, stair climbing, using his hands, bending, standing, kneeling, walking, squatting, reaching, completing tasks, and occasionally concentrating and getting along with others, R. 193, and that his ability to walk varied daily depending on the amount of pain he experienced, R. 194.

    *2.*    *DDS Physician Opinions*

On September 4, 2012, as part of the initial review of Reynolds's claim, DDS expert James Wickham, M.D., assessed his physical functioning. R. 62–64. Wickham found that Reynolds could lift and carry twenty pounds occasionally and ten pounds frequently and could stand or walk for about six hours and sit for more than six hours in an eight-hour workday. R. 63. As to postural limitations, Dr. Wickham found that Reynolds could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. *Id.* Dr. Wickham also found manipulative limitations, specifically that Reynolds was limited in reaching to the left overhead and was limited handling, fingering, and feeling with his left hand. R. 63–64. Dr. Wickham thus found that Reynolds had a maximum sustained work capability for light work. R. 65. On reconsideration, in an opinion dated December 21, 2012, Tony Constant, M.D., reassessed Reynolds's physical functioning, and confirmed Dr. Wickham's findings. R. 75–77. Dr. Constant also limited Reynolds to light work. R. 78.

    *3.*    *LPT Perault*

On April 24, 2014, Reynolds presented for a Functional Capacity Evaluation ("FCE"), conducted by consulting examiner Leann Perault, LPT. R. 561–71. LPT Perault noted that Reynolds was cooperative and showed a consistent and valid effort in all test items during the three hours and twenty minutes of testing. R. 561. Pertinently, LPT Perault found that he was limited with walking, squatting, lifting, climbing, forward bending, kneeling, elevated work, lifting overhead, carrying, and gripping. *Id.* LPT Perault further explained that he was unable to carry out and negotiate stairs frequently, could walk occasionally, and had gait deviations. *Id.* As a result, she opined that Reynolds "demonstrated abilities within the Sedentary category of work," as defined by the United States Department of Labor, specifically that he could sit for four to five and a half hours, stand for up to two hours and forty minutes, and walk for thirty to forty minutes in an eight-hour workday. *Id.*

## IV. Discussion

Reynolds mounts three primary challenges to ALJ Mates's decision. Pl. Br. 9–20, ECF No. 15. First, he argues that the ALJ erred by rejecting his pain testimony without a factually or legally sufficient reason. *Id.* at 11–19. Second, he alleges that the ALJ improperly ignored opinion evidence, specifically Dr. Stem's opinion that he was severely disabled, *id.* at 10–11, and his wife's opinion contained in a third party function report, *id.* at 19–20. Third, he challenges the RFC, arguing that ALJ Mates incorrectly found that he had the capacity for sedentary work despite LPT Perault's contrary conclusion that he could sit for only five and a half hours. *Id.* at 9–10. None of Reynolds's arguments are persuasive.

## A.    *Severity of Symptoms*

Reynolds argues that the ALJ erred in evaluating his statements concerning the severity of his symptoms. Pl. Br. 11–19. The regulations set out a two-step process for evaluating a

claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[2] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a)–(b); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig,* 76 F.3d at 595.

The ALJ cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). Nonetheless, a claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." *Craig*, 76 F.3d at 595.[3] The ALJ must consider

---

[2] Objective medical evidence is any "anatomical, physiological, or psychological abnormalit[y]" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 404.1528(a).

[3] The Social Security Administration now cautions that the second prong of this analysis should not be approached with an undue focus on the claimant's "credibility." *See* SSR 16-3p, 2016 WL 1119029, at *1. The scope of this inquiry should be limited to those matters concerning the claimant's symptoms, rather than other factors that might otherwise be probative of the claimant's overall honesty. *Id.* at *10. "In evaluating an individual's symptoms, [ALJs] will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Id.* Statements that are internally inconsistent or that are inconsistent with the other evidence of record, however, may lead the ALJ to "determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* at *7.

all the evidence in the record, including the claimant's other statements, his daily activities, his treatment history, any medical-source statements, and the objective medical evidence, *id.* (citing 20 C.F.R. § 404.1529(c)), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements, *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013).

Reynolds asserts that the ALJ, by concluding he cleared the step-one threshold, also found that the objective medical evidence showed he had a condition that was reasonably likely to cause pain "in the amount and degree alleged." Pl. Br. 12 n.6, 14, 18. Thus, Reynolds contends that the ALJ erred in not finding his testimony "entirely credible" because he passed the first step of the analysis. *Id.* at 18–19. This argument, however, misconstrues the nature of the step-one inquiry. As the Fourth Circuit made clear in *Craig*,

> This threshold test does not, as the regulation is careful to emphasize, entail a determination of the "intensity, persistence, or functionally limiting effects" of the claimant's asserted pain. . . . At this stage of the inquiry, the pain claimed is not directly at issue; the focus is instead on establishing a determinable underlying impairment . . . which could reasonably be expected to be the cause of the disabling pain asserted by the claimant.

76 F.3d at 594 (internal citations omitted). The first step does *not* address "whether the severity of an individual's alleged symptoms is supported by the evidence," and it may be satisfied "even though the level of pain an individual alleges may seem out of proportion with the objective medical evidence." SSR 16-3p, 2016 WL 1119029, at *3. Thus, the ALJ's finding that Reynolds's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," R. 30, says nothing about whether the *degree* of pain and limitation alleged finds any support in the record.

As to the second prong of this analysis, ALJ Mates offered multiple reasons, supported by substantial evidence, for finding that Reynolds's statements concerning the intensity,

persistence, and limiting effects of his symptoms were inconsistent with the other evidence of record. To be sure, one reason does not hold up to scrutiny. The ALJ reasoned that the record showed a substantial period where Reynolds did not require significant medication and, for support, pointed to Dr. Jane's note from May 2012 that medications prescribed in November 2011 were never refilled. R. 30. In November 2011, PA Szabo—who, along with Dr. Jane, treated Reynolds at UVA—prescribed Neurontin, but no other medications. R. 227. Whether or not Reynolds had Dr. Jane's prescriptions refilled, however, the record clearly shows that Dr. Konieczny also treated Reynolds with Neurontin in February, R. 253, March, R. 251, and April 2012, R. 250. Thus, the ALJ's finding that Reynolds did not take pain medication during this period is not supported by the record, and this reason offered by the ALJ provides no basis to question Reynolds's allegations of severe symptoms.

Nonetheless, ALJ Mates provided other valid reasons to support his finding that Reynolds's stated symptoms were not as severe as claimed. First, he references inconsistencies between Reynolds's own statements and the severity of symptoms alleged. R. 31. The ALJ specifically notes that on October 16, 2012, Reynolds reported that he felt fine sitting down. *Id.* Reynolds counters that this reasoning is flawed because he reported during the FCE that he could sit only for up to fifteen minutes unless in a recliner. Pl. Br. 17; *see also* R. 571. The record, however, reveals no other instance, with the exception of his testimony at the administrative hearing, R. 45, where Reynolds said he cannot sit comfortably. *See, e.g.,* R. 181, 193, 376, 491. The ALJ also cites a few of Reynolds's activities of daily living, such as caring for his personal needs, driving, shopping, and assisting with his son's wedding preparation as suggesting a greater level of physical functioning than alleged. R. 31. Reynolds argues that the ALJ omitted important qualifiers, such as his explanation that he shopped only once every few months and his

subjective report to PT Black that he was in extreme pain after assisting with the wedding preparation. Pl. Br. 16–17. These reported activities are fairly limited, and the record provides no information about what activities Reynolds engaged in when he helped for a single day with his son's wedding. Even so, Reynolds told his physical therapist that he walked around all day at a mud race and vacationed at Bugg's Island where he went swimming. R. 358, 362, 364. The physical therapist also noted that Reynolds's extracurricular activities interfered with his rate of healing. R. 352. Although these activities alone do not show that Reynolds is capable of sedentary work, they are nonetheless inconsistent with the claimed severity of his limitations.

Second, the ALJ notes that Reynolds's claimed symptoms were inconsistent with the objective evidence. R. 30–31. The ALJ is not required to accept a claimant's subjective allegations to the extent that these statements are inconsistent with objective medical findings. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (finding no error when "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility"); *see also Craig*, 76 F.3d at 595. Reynolds argues that the objective evidence relied upon by the ALJ was flawed and that he should have considered other objective findings instead. Pl. Br. 12–14. For example, he contends that both the December 2011 myelogram, R. 240–41, and Dr. Konieczny's findings in February 2012, R. 252–53, undermine the ALJ's reliance on Dr. Jane's findings from January 2012, which revealed Reynolds to be neurologically intact, with symmetric reflexes, full strength, normal bulk and tone, sensation intact to light touch and pinprick, and imaging that showed no active denervation,[4] R. 30; *see also* R. 223, and from May 2012, which revealed no nerve root involvement, no active neuropathy, and no objective explanation for continued complaints of pain, R. 30; *see also* R. 277–80. Dr. Konieczny and Dr.

---

[4] The ALJ wrote that the imaging showed no "degeneration," but the treatment notes clearly say "denervation." This typographical error, however, does not appear to have any bearing on the outcome of the ALJ's opinion.

18

Jane's observations of Reynolds's left arm strength and sensation are indeed contradictory. The ALJ acknowledged Dr. Konieczny's findings, R. 27, and he recognized that the record contained objective signs and clinical examinations showing abnormalities, albeit ones he characterized as limited, R. 31. Moreover, as reflected in the RFC, the ALJ credited to an extent both Reynolds's claims and the evidence showing limitations by restricting Reynolds's use of his left arm to no more than occasional reaching and manipulation.

Reynolds then tries to discredit Dr. Jane's opinion by speculating that he did not review the December 2011 myelogram results for the January 2012 appointment. Pl. Br. 13. The record does not address that point, but at that appointment Dr. Jane did reference the EMG showing no denervation. R. 223. Furthermore, in his May 2012 opinion, Dr. Jane specifically identified the December 2011 cervical myelogram as one of the clinical findings that provided "[n]o explanation for [Reynolds's] symptoms." *See* R. 277. Reynolds also criticizes Dr. Jane's opinion because it came before Reynolds had imaging of his lumbar spine that showed stenosis and involvement of the nerve root and thecal sac. Pl. Br. 13–14. Dr. Jane, however, treated Reynolds for his neck pain, *see* R. 223, and Reynolds does not explain how this imaging of his lumbar spine diminishes Dr. Jane's assessment of his neck problems and any related limitations.

Ultimately, Reynolds's arguments do not show that the ALJ was unreasonable in relying on Dr. Jane's assessment. Reynolds essentially asks the Court to reweigh the evidence. This is not a situation where the ALJ completely ignored contrary objective evidence and cherry-picked the portions of the record that supported his decision; instead, he thoroughly recited the medical evidence, including that cited by Reynolds in his brief, and chose to place more weight on Dr. Jane's findings. "[T]he Fourth Circuit has also admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the evidence." *Davis v. Barnhart*, 392 F. Supp. 2d 747,

751 (W.D. Va. 2005) (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). Moreover, Reynolds ignores other objective evidence that supports the ALJ's conclusion. For example, Reynolds was consistently observed to have a normal gait, R. 227 (Nov. 18, 2011), 459 (Aug. 13, 2012), 486 (Nov. 11, 2013), 489 (Aug. 20, 2013); frequently had negative straight leg raise test, R. 255 (May 11, 2012), 256 (Mar. 29, 2012), 264 (July 14, 2011), 459 (Aug. 13, 2012, on the left), 570 (Apr. 24, 2014); and often displayed relatively normal findings on physical examination, R. 252 (full strength in bilateral lower extremities and normal muscle tone on Feb. 5, 2012), 460 (no tenderness upon palpation and normal lower extremity muscle tone on Aug. 13, 2012), 486 (upper and lower extremity deep tendon reflexes intact bilaterally on Nov. 11, 2013). This record provides ample support for the ALJ's decision to credit Dr. Jane's findings, R. 30, and this Court does not have the authority to reweigh the evidence, *see Stevens v. Colvin*, No. 6:14cv21, 2015 WL 5510928, at *4 (W.D. Va. Sept. 16, 2015) ("[E]ven if the court would have made contrary determinations of fact, it must nonetheless uphold the ALJ's decision, so long as it is supported by substantial evidence.").

Third, the ALJ explains that other than undergoing neck surgery in October 2011, Reynolds's treatment was generally routine and conservative. R. 30. The ALJ is permitted to consider the nature of Reynolds's treatment in evaluating the severity of his symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(iv)–(v); *Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) ("[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination . . . ."). The ALJ's opinion here is lacking in some respects. He correctly noted that multiple medical providers concluded that Reynolds was not a candidate for further cervical surgery.[5] R. 30; *see also* R. 251, 253, 279. He neglected to

---

[5] Reynolds attempts to undermine the ALJ's opinion here by relying on *Van Tran v. Colvin*, No. EDCV 15-0671 AS, 2016 WL 917891 (C.D. Cal. Mar. 8, 2016), because in that case, "the ALJ was reversed for

20

discuss, however, the opinion of PA-C Chantal, who, under the supervision of Dr. Stem, informed Reynolds that his options for treating his lumbar spine pain included medications, physical therapy, injections, and surgical fusion. R. 491. He also did not discuss that Dr. Stem likewise identified surgery as an option to address Reynolds's lumbar spine pain. R. 503.

Nevertheless, the ALJ's omission is harmless because the discussion of lumbar surgery as a potential treatment option does not undermine his conclusion that Reynolds's treatment of injections, physical therapy, and pain medication was effective in controlling his pain. Both the objective evidence and Reynolds's subjective reports reveal the effectiveness of this treatment. For example, Reynolds reported that medications often provided him relief from his various ailments. *See, e.g.*, R. 44 (testimony at administrative hearing), 255 (gets by on Tramadol on May 11, 2012), 491 (pain pill helps at night on Oct. 16, 2012), 511 (hydrocodone does help on May 3, 2013). He also showed improvements throughout the course of physical therapy. He conveyed to PT Black on numerous occasions that he felt better and that physical therapy was helping. *See, e.g.*, R. 352 (July 11, 2012), 356 (June 27, 2012), 360 (June 20, 2012), 372 (June 6, 2012). PT Black also noted objective signs of consistent improvements during Reynolds's treatment, *see, e.g.*, R. 354 (improved mobility of musculature through lumbar spine on July 11, 2012), 358 (improved flexibility and ability to walk around on June 25, 2012), 364 (good overall

_____

unjustifiably assuming, based on the claimant's lack of surgery, that his treatment was 'conservative,' and hence, indicative of deceit," Pl. Br. 11. Reynolds's purported comparison fails not only because his underlying premise is inaccurate, as the ALJ never made such an assumption, but also because the case is factually distinguishable. In *Van Tran*, the ALJ specifically stated that the "lack of more aggressive treatment or surgical intervention suggests that the claimant's symptoms and limitations were not as severe as he alleged." 2016 WL 917891, at *4. The court in that case noted, however, that the evidence showed that surgical intervention was not an available option and that although the claimant was deemed not to be a surgical candidate, his condition continued to worsen. *Id.* at *4–5. Here, ALJ Mates did not make such a sweeping conclusion in the face of alternative explanations for the conservative nature of the treatment. Nothing indicates that surgery was not an option for Reynolds; indeed, it was discussed as a possibility, but he elected instead to undergo conservative treatment methods. *See, e.g.*, R. 491, 495, 503. Moreover, unlike the plaintiff in *Van Tran*, the evidence here shows that Reynolds improved after undergoing conservative treatment. *See, e.g.*, R. 503, 511, 519.

21

progression on June 15, 2012), 366 (improved range of motion and ability to ambulate three times the original distance without a break on June 13, 2012), and ultimately concluded that his overall functional status had improved as a result of physical therapy, R. 348 (July 16, 2012). Furthermore, the continual treatment with NRBs, R. 502 (Jan. 9, 2013), 510 (Mar. 20, 2013), 518 (May 29, 2013), 525 (Aug. 21, 2013), 533 (Dec. 18, 2013), 536 (Mar. 5, 2014), were effective to the point where Reynolds himself concluded that the pain relief he got from the injections was "good enough," R. 528 (Dec. 4, 2013). Moreover, Dr. Stem indicated that he was pleased with the results Reynolds experienced. *Id.*

Reynolds maintains that these treatments are not appropriately considered conservative and cites case law from the Seventh Circuit in support. Pl. Br. 12. In *Schomas v. Colvin*, the Seventh Circuit recognized that treatment with narcotic pain relievers, steroid injections, and major surgery after the claimant had tried over the counter anti-inflammatory medications, chiropractic treatment, and physical therapy undermined the ALJ's conclusion that the claimant had received only conservative treatment. 732 F.3d 702, 709 (7th Cir. 2013). By contrast, however, this Court and the Fourth Circuit have observed that treatment consisting of medications and injections may be appropriately considered conservative. *Dunn*, 607 F. App'x at 272–75; *Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6, 2016) ("It was reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain medication, physical therapy, and steroid injections, as 'conservative.'"), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016). Moreover, Reynolds's argument ignores the point that regardless of the ALJ's characterization of Reynolds's treatment as conservative or otherwise, the record supports the ALJ's conclusion that Reynolds's treatment adequately controlled his pain. It is well settled that pain is not disabling if it can be reasonably controlled with medication

22

or treatment, *see Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *Fisher v. Comm'r of Soc. Sec.*, No. 6:11cv26, 2013 WL 1192576, at *4 (W.D. Va. Mar. 22, 2013), and here substantial evidence supports the ALJ's conclusion that Reynolds's various treatments adequately controlled his pain, *see Legg v. Astrue*, 5:08cv54 2009 WL 366208, at *3 (W.D. Va. Feb. 12, 2009) ("It must be recognized that the inability to do work without any subjective discomfort does not of itself render a claimant totally disabled." (citing *Craig*, 76 F.3d at 394–95)); *see also Kincaid v. Colvin*, No. 14-3905, 2016 WL 824867, at *6 (D.S.C. Jan. 25, 2016) ("An individual is not required to by symptom-free to work."), *adopted by* 2016 WL 827755 (D.S.C. Mar. 2, 2016). Thus, regardless of whether Reynolds's treatment was characterized as conservative or aggressive, the ALJ could reasonably determine that the actual treatment rendered was relatively effective in controlling Reynolds's pain.

In sum, Reynolds's challenge to the ALJ's credibility analysis is subverted by his flawed interpretation of the step-one inquiry, his insistence that the Court reweigh the medical evidence to support his claim, his unsuccessful attempt to identify material inadequacies in the ALJ's assessment of his conservative treatment, and his failure to address the ALJ's conclusion that his treatment adequately controlled his pain. To that end, I find that substantial evidence supports the ALJ's decision.

B.    *Opinion Evidence*

1.    *Dr. Stem*

As for the opinion evidence, Reynolds first contends that the ALJ erred by failing to consider or weigh Dr. Stem's opinions that Reynolds was severely disabled. Pl. Br. 10–11. The Commissioner retains the sole responsibility for determining whether a claimant is disabled, 20 C.F.R. § 404.1527(d)(1); *see also Dunn*, 607 F. App'x at 268 ("[A] medical expert's opinion as

to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone."), but the ALJ must carefully consider a medical source's opinion—including one on an issue reserved to the Commissioner—and should never ignore it, *see* SSR 96–5p, 1996 WL 374183, at *2–3 (July 2, 1996). In doing so, however, the ALJ need not afford "any special significance" to the source's medical qualifications. 20 C.F.R. § 404.1527(d)(3); *see also Morgan v. Barnhart,* 142 F. App'x 716, 722 (4th Cir. 2005) ("The ALJ is not free . . . simply to ignore a treating physician's legal conclusions, but must instead 'evaluate all the evidence in the case record to determine the extent to which [the conclusions are] supported by the record.'" (quoting SSR 96–5p, 1996 WL 374183, at *3)).

Here, Reynolds argues that Dr. Stem offered medical opinions that Reynolds was unable to work and that he scored 52 on the Oswestry Disability Index. Pl. Br. 10–11; *see also* R. 503, 512. Although Reynolds recognizes that ultimate opinions of disability are reserved to the Commissioner, he nevertheless claims that the ALJ completely neglected Dr. Stem's opinions, thus constituting legal error. Pl. Br. 10–11.

Contrary to his assertion that the ALJ "did not even take cognizance of the fact that Dr. Stem had twice expressed his opinion that Reynolds was disabled," Pl. Br. 11, ALJ Mates, in his recitation of the medical evidence, acknowledged that "Dr. Stem noted that [t]he claimant was unable to work at that time [R. 503]," R. 29. In his treatment notes from that session, Dr. Stem observed that Reynolds had difficulty walking, although Reynolds also reported walking better after injections, R. 503, 505, but he did not identify any specific functional limitations. Even though the ALJ did not address what weight, if any, to give this opinion, he did specifically evaluate a similar opinion from PA-C Chantal. R. 29, 31, 470. The ALJ rejected PA-C Chantal's opinion that Reynolds could not work because he found that it relied on subjective reports of

symptoms, was not consistent with medical findings, and was on an issue reserved to the Commissioner. R. 31. Reynolds did not challenge this finding, and, for the reasons identified by the ALJ, it is supported by substantial evidence. Thus, the ALJ's failure to analyze Dr. Stem's identical opinion was harmless.

Reynolds also argues that by recording his Oswestry Disability Index score of 52—which indicates severe disability—in the treatment notes, Dr. Stem expressed an opinion that Reynolds was severely disabled. Pl. Br. 10. As the Commissioner points out, however, the source[6] provided by Reynolds explains that the Oswestry Disability Index reflects the patient's self-reported symptoms, not the medical provider's opinion. *See* Def. Br. 12, ECF No. 17; *see also Hejazi v. Colvin*, No. 13-cv-11129-DPW, 2014 WL 3513398, at *12 (D. Mass. July 11, 2014) (explaining that the Oswestry Disability Index "is not a medical opinion at all," but is instead more accurately a "vehicle for patients to self-report their symptoms"). It is well settled that a medical provider does not convert subjective complaints into objective medical evidence by merely recording them. *See Craig*, 76 F.3d at 590 n.2. At most, then, this score reflects Reynolds's subjective report of his symptoms, which the ALJ properly analyzed elsewhere. *See supra* Pt. IV.A. Nowhere else in his treatment notes does Dr. Stem explain that by recording this score, he endorsed the results and concurred with the conclusion. Moreover, during the same visit, Dr. Stem noted that Reynolds had received some relief from the injections, scheduled another one, and refilled a prescription for hydrocodone, but offered no opinion on Reynolds's functioning. R. 511–14. Simply put, there is no basis to conclude that the Oswestry Disability Index score reflects Dr. Stem's opinion of Reynolds's functional ability. Accordingly, I find that the ALJ did not err in his treatment of Dr. Stem's opinion or the Oswestry Disability Index score.

---

[6] *Oswestry Low Back Pain Disability Questionnaire*, Mich. St. U. Rehabilitation, http://www.rehab.msu.edu/_files/_docs/Oswestry_Low_Back_Disability.pdf (last visited Jan. 24, 2017).

### 2. Reynolds's Wife

Reynolds also contends that the ALJ did not properly consider or weigh his wife's opinion contained in a third party function report. Pl. Br. 19–20. In evaluating whether a claimant is disabled, the ALJ is permitted to use evidence from nonmedical sources, including spouses, at his discretion. *See* 20 C.F.R. § 404.1513(d)(4). Nonmedical sources can provide valuable evidence as such individuals often have close contact with the claimant and thereby have "personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006). There is no bright-line rule for evaluating such evidence, however, and each is decided on a case-by-case basis. *Id.* at *5. When the opinion evidence comes from a spouse, it is appropriate for an ALJ to consider such factors as "the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id.* at *6.

Here, Reynolds contends that his wife's opinion corroborated his testimony and argues that it was legal error for the ALJ to give it less weight solely because it was from a lay person. Pl. Br. 19–20. Reynolds's argument ignores the ALJ's second stated reason for assigning his wife's opinion limited weight, specifically that "[i]t does not outweigh the accumulated medical evidence regarding the extent to which the claimant's limitations can reasonably be considered severe." R. 32. Thus, the ALJ did not, as Reynolds suggests, automatically assign limited weight to his wife's opinion because it was from a lay person; instead, he concluded that because it was a lay opinion, it did not hold as much weight as objective medical evidence, which suggested greater functional ability. *Id.* It is not error for an ALJ to decline to rely on lay opinion evidence if it is contradicted by other evidence in the record. *See Gray v. Colvin*, No. 6:13cv14, 2014 WL

4660792, at *8 (W.D. Va. Sept. 17, 2014) ("Notably, the United States Court of Appeals for the Fourth Circuit has held that it is unnecessary to discuss the testimony of lay witnesses where it is inconsistent with other evidence in the record." (citing *Laws v. Celebrezze*, 368 F.2d 640, 644 (4th Cir. 1966))). Accordingly, I find that substantial evidence supports the ALJ's decision to assign Reynolds's wife's opinion limited weight.

## C.    RFC Challenge

Lastly, Reynolds challenges the ALJ's RFC finding, particularly as to his evaluation of LPT Perault's opinion. Pl. Br. 9–10. A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and why he discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

Reynolds argues that the ALJ's RFC is flawed because it relied on LPT Perault's opinion that he could perform sedentary work. Pl. Br. 9. He specifically points to LPT Perault's finding that he could sit for between four and five and a half hours during the day. *Id.* Because Reynolds maintains that sedentary work requires the ability to sit for at least six hours during the day, he

27

concludes that the ALJ erred by characterizing LPT Perault's opinion as being consistent with sedentary work. *Id.* at 9–10.

Had the ALJ adopted LPT Perault's specific sitting restriction of between four and five and a half hours a day, I would agree that he erred in finding that Reynolds could perform sedentary work. The ALJ, however, did not accept that specific restriction. *Cf. Morgan v. Colvin*, No. 5:15-CV-00266-D, 2016 WL 4217822, at *5 (E.D.N.C. July 21, 2016) ("It is well-settled that in according significant weight to a medical opinion, an ALJ is not bound to accept or adopt all the limitations set forth therein."). He found that Reynolds could "perform sedentary work," consisting of "lifting or carrying 10 pounds occasionally and less than 10 pounds frequently, standing or walking about 2 hours in an 8-hour workday, and sitting about 6 hours in an 8-hour workday." R. 23 n.1. This was an accurate statement of sedentary work. *See* SSR 96-9p, 1996 WL 374185, at *3, *6 (explaining that the full range of sedentary work includes an amount of sitting that "would *generally* total about 6 hours of an 8-hour workday" and further stating that "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday"); *cf. Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984) (explaining that the term "sedentary" has the same meaning as in the *Dictionary of Occupational Titles*, which entails sitting for "*at least*" 6 hours in an 8-hour day) (quoting *Van Huss v. Heckler*, 572 F. Supp. 160, 166 (W.D. Va. 1983))).

In determining Reynolds's RFC, ALJ Mates noted that Reynolds primarily complained of pain from walking and standing, but did not experience such severe symptoms when sitting. R. 31; *see also* R. 181 (functional report indicating that Reynolds's conditions affected his ability to walk and stand, but not sit), 193 (wife's third party function report did not note problems with sitting), 376 (physical therapy note that Reynolds said, "I get the most relief from sitting in the

28

car and in the chair."), 491 (treatment note that Reynolds "notes more pain with walking or standing"). ALJ Mates found that Reynolds could perform some activities of daily living and deemed his complaints of more severe limitations, including Reynolds's testimony that he could sit for only five to ten minutes, R. 25, not credible. *See supra* Pt. IV.A. He also considered "LPT Perault's general endorsement of sedentary work . . . and found [it] consistent with the residual functional capacity determined herein." R. 31. Although assigning an opinion weight because it supports the RFC gets things backwards, *cf. Mascio*, 780 F.3d at 639, the ALJ nonetheless adequately explained the rationale for his RFC determination.

Moreover, the ALJ relied on other opinions and evidence in the record in formulating his RFC. The ALJ considered the DDS physicians' opinions that Reynolds could perform the higher exertional demands of light work, but found that the entire record demonstrated that sedentary work was more accurate. R. 31. Although the ALJ's RFC analysis could be more fulsome, he adequately explained that he found Reynolds's primary limitations concerned walking and standing as well as left arm functioning. He observed that Reynolds had not reported to his doctors that he had problems sitting, and his treatment notes did not document the severe sitting restrictions Reynolds testified about at the hearing. R. 31. Finally, he found that LPT Perault's findings generally supported sedentary work. Therefore, this analysis provides substantial evidence for the ALJ's finding that Reynolds could sit for about six hours a day.

## V. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that Reynolds's motion for summary judgment, ECF No. 14, be **DENIED**, the Commissioner's motion for summary judgment, ECF

29

No. 16, be **GRANTED**, the Commissioner's final decision be **AFFIRMED**, and this case be **DISMISSED** from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 6, 2017

Joel C. Hoppe
United States Magistrate Judge

30